UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

SENIADA B. COLEMAN,                      §
                                         §
        Plaintiff,                       §
VS.                                      §        CIVIL NO. 2:12-CV-354
                                         §
CAROLYN W. COLVIN[1],                    §
                                         §
        Defendant.                       §

## MEMORANDUM AND RECOMMENDATION

Seniada Coleman filed a complaint seeking reversal of the decision of the defendant Commissioner of Social Security ("Commissioner") for the purpose of receiving Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Plaintiff filed a brief in support of her application on May 8, 2013 (D.E. 18). Defendant filed a response brief in support of the Commissioner's determination on May 8, 2013 (D.E. 19).  For the reasons discussed below, it is respectfully recommended that the Commissioner's decision be vacated and Plaintiff's case be remanded for further consideration.

## BACKGROUND

Plaintiff first filed an application for DIB and SSI on March 16, 2006, alleging an onset date of February 3, 2003 (Tr. 185-194; D.E. 16-6 at 2-11).  The application was denied initially (Tr. 103, 117, 90-97, 10-20, 1-3; D.E. 16-5 at 2, 16; 16-4 at 9-16; 16-3 at

---

[1] Carolyn W. Colvin is the Acting Commissioner of Social Security, and the appropriate defendant.  The Clerk shall substitute Carolyn W. Colvin as the defendant. Fed. R. Civ. P. 25(d)(1).

11-21, 2-4).  While the first application was pending, Plaintiff filed a second application on May 3, 2008, once again alleging an onset date of February 3, 2003 (Tr. 202-207; D.E. 16-6 at 19-24).  In a remand by the Appeals Council to the Administrative Law Judge ("ALJ") addressing the first application, the Appeals Council directed the ALJ to consider both applications in his subsequent order (Tr. 100; D.E. 16-4 at 19).  The ALJ denied Plaintiff's applications on January 28, 2009 (Tr. 10-20; D.E. 16-3 at 11-21).  The Appeals Council denied Plaintiff's request for review on August 20, 2010 (Tr. 1-3; D.E. 16-3 at 2-4).

Plaintiff filed an action seeking review of the denial of benefits in the District Court in *Coleman v. Astrue*, No. 2:10-cv-350 (S.D. Tex. 2011).  Defendant in that action filed an unopposed motion to remand the case for further administrative proceedings and the Court remanded the case on April 15, 2011 (Tr. 877; D.E. 16-14 at 29).  In the order remanding the case, the District Court noted that Plaintiff had filed a third application for benefits and had been found disabled as of January 29, 2009 in an ALJ decision dated February 24, 2011 (Tr. 867-877; D.E. 16-14 at 19-29).

Based on the remand order, an ALJ hearing was held on March 28, 2012 to address Plaintiff's eligibility for benefits prior to January 29, 2009 (Tr. 802-849; D.E. 16-13 at 34-80).[2]  On April 19, 2012 the ALJ denied Plaintiff's application for benefits (Tr.

---

[2] It was noted at the hearing that although Plaintiff had been found disabled as of January 29, 2009, the third application was only for SSI because her disability insured status had expired approximately seven months earlier, on June 30, 2008  (Tr. 805, 11; D.E. 16-13 at 37, 16-3 at 12).  Also, because of an apparent error in calculating Plaintiff's resources, she was not actually eligible to receive SSI benefits.  Therefore, even though she was

782-794; D.E. 16-13 at 14-26).  Plaintiff filed this civil action seeking reversal of the ALJ

decision on November 18, 2012 (D.E. 1).[3]

Plaintiff alleges that she was unable to work prior to January 29, 2009 because of a

knee injury, hip pain, severe uncontrolled diabetes, diabetic neuropathy, diabetic retinitis,

restless leg syndrome, hypertension, hyperlipidemia, severe chronic migraines, atrial

fibrillation, a corneal ulcer in her right eye, heel spurs and depression (Tr. 217, 61, 826-

827; D.E. 16-7 at 6, 16-3 at 62, 16-13 at 58-59).  Her reported symptoms include

dizziness, fatigue, blurred vision, pain in her hips, knees and feet and numbness and

tingling in her lower extremities (Tr. 233, 260, 64, 66; D.E. 16-7 at 22, 49; D.E 16-3 at

65, 67).  Prior to the onset of her disability, Plaintiff worked as commissary supervisor

for a convenience store chain, a food service manager at a fast food restaurant and a cook

at a restaurant (Tr. 225; D.E. 16-7 at 14).  Plaintiff alleges that she was disabled from her

alleged onset date of February 3, 2003 through January 29, 2009.

## MEDICAL EVIDENCE

Plaintiff tripped at work on February 3, 2003 and fell on both knees and her left

hand, resulting in a nondisplaced tibial plateau fracture of her left knee.  An MRI also

showed Grade II chondromalacia involving the patellar articular cartilage in the medial

facet.  She was placed in a knee immobilizer, given crutches and told not to put any

---

found disabled as of January 29, 2009, she never received any benefits (Tr. 805; D.E. 16-
3 at 37).

[3] Because the District Court remanded Plaintiff's claim for an ALJ hearing, there was no
automatic review of the decision by the Appeals Council and Plaintiff missed the
deadline for seeking a review based on her exceptions to the decision.  Therefore the
ALJ's decision was the final decision of the Commissioner and Plaintiff could seek
review only by filing a new civil action (Tr. 771-773; D.E. 16-13 at 3-5).

weight on her knee.  Her past medical history was significant for diabetes and high blood pressure. (Tr. 338, 387, 359, 364; D.E. 16-8 at 49, 98, 70, 75).

In April 2003 Plaintiff was diagnosed with a corneal ulcer in her right eye and treated with an antibiotic and an ointment (Tr. 408-411; D.E. 16-9 at 15-19).  She reported that her eye was "100% better" on April 25, 2003 (Tr. 402; D.E. 16-9 at 9). Plaintiff had another eye ulcer in September 2006 but it resolved with medication (Tr. 513-518; D.E. 16-10 at 42-47).

In June 2003 plaintiff complained of pain in both knees and said sometimes her knees gave out.  Her physical examination was unremarkable.  She was given Ultracet for pain and was cleared to return to restricted duty (Tr. 323; D.E. 16-8 at 34).  Plaintiff attended a course of physical therapy and gained significant strength and stability in her knee joint.  She continued to report retro-patellar pain and tenderness with loaded knee flexion/extension.  Overall, she felt deconditioned and did not know if she could tolerate an eight-hour workday, especially if it involved standing and lifting (Tr. 368; D.E. 16-8 at 79).  Plaintiff was prescribed a one-month work conditioning program to be followed by a functional capacity evaluation (Tr. 312; D.E. 16-8 at 23).

At the functional capacity evaluation, Plaintiff reported that her position at the convenience store had been eliminated but she hoped to train as a home aide/attendant. Other than mild tenderness to both knees she was doing well.  She could lift 36.5 pounds occasionally and less weight more frequently.  She had an average pushing/pulling ability of 262 pounds occasionally.  Her sitting tolerances were unaffected and she was observed to tolerate standing for approximately 30 minutes.  Walking did not cause her any

discomfort, but it was recommended that partial squatting and stair-climbing should be kept to a minimum and kneeling and crawling activities were not recommended.  It was determined that she could work at a "Light-Medium Physical Demand."  (Tr. 307-308; D.E. 16-8 at 18-19).  It was not recommended that she return to her previous employment but it was believed she could do the job of a home aide/attendant (Tr. 308; D.E. 16-8 at 19).

Plaintiff underwent an internal medicine consultation on May 29, 2006.  Her chief complaints were diabetes, migraine headaches, arthritis and neuropathy.  Despite medication, her blood sugar remained high.  She had developed tingling and numbness in her legs and feet.  She was having headaches three times per month, accompanied by photophobia, phonophobia and nausea.  Her physical examination was normal.  She was able to sit, stand and move about and could lift, carry and handle objects.  Her gait was normal but she had trouble walking on her heels and toes mostly due to knee discomfort. She had problems squatting and hopping.  She did not use an assistive device.  She was assessed with Type II diabetes mellitus, diabetic peripheral neuropathy, migraine headaches and a history of arthritis (Tr. 450-461; D.E. 16-9 at 66-68).

In January 2007 Plaintiff reported to her doctor that she was not taking any medications because she did not have any money with which to buy prescriptions.  She complained of pain and tingling in her feet, especially at night, fatigue and frequent migraine headaches.  Her physical examination was unremarkable except for slightly decreased sensation in the lower aspects of her feet.  She was assessed with uncontrolled

Type II diabetes with peripheral neuropathy, hypertension and migraines (Tr. 566; D.E. 16-11 at 20).

Plaintiff's diabetes continued to be uncontrolled even with medication (Tr. 559-563; D.E. 16-11 at 13-18). In July 2007 Plaintiff went to the emergency room with nausea and palpitations after twice fainting and falling. She was in atrial fibrillation with a fairly well-controlled ventricular response. A CT scan suggested the possibility of a small subdural hematoma and small subarachnoid hemorrhage (Tr. 641-642; D.E. 95-96). She was admitted to the hospital and treated with Lovenox and Coumadin. Follow-up CTs of the head showed resolving bleeding (Tr. 639-640; D.E. 16-11 at 93-94).

In January 2008 Plaintiff reported occasional heart palpitations and her diabetes was poorly controlled. Her blood pressure was well-controlled on medication. Her musculoskeletal system was symmetric and she was described as pain free with a full range of motion (Tr. 659-660; D.E. 16-11 at 113-114). She had bilateral numbness and paresthesias in her lower extremities (Tr. 750; D.E. 16-12 at 71). In March and April 2008 Plaintiff reported that her blood sugar continued to fluctuate even though she was taking medication and watching her diet carefully. She also had severe pain in her shoulders and arms that was unresponsive to Naproxen (Tr. 651-654; D.E. 16-11 at 105-108).

At a psychiatric evaluation on June 24, 2008, Plaintiff reported being depressed because she could not work and did not see much hope. She was taking Paxil. Her mental status examination was normal, although she became tearful when she talked about her illnesses. She and her husband were raising their 14-year-old grandson and she

took care of all her own personal care.  She had contact with her family and attended church once a month.  She was diagnosed with depression and an anxiety disorder and assessed a GAF of 55.[4]  Her prognosis was poor because of her health issues (Tr. 681-684; D.E. 16-12 at 2-5).

In July 2008 Plaintiff underwent a second consultative internal medicine examination.  She had unstable blood sugar levels, tingling in her upper and lower extremities, pain in both shoulders, elbows, hands and knees, depression, insomnia and eye ulcers.  On examination, there was no evidence of corneal ulcers and her musculoskeletal examination was normal.  Deep tendon reflexes were absent in her upper and lower extremities with decreased vibratory and pinprick response.  An X-ray of her right knee showed minimal patellar spurring and the knee joint was slightly narrowed medially.  An X-ray of her right hip was unremarkable (Tr. 680; D.E. 16-11 at 134).  The only functional limitations described by the doctor were that her grip strength, ability to reach, handle, finger and grasp were decreased in both upper extremities (Tr. 676-678; D.E. 16-11 at 130-132).  An August 4, 2008 X-ray of her left heel showed a heel spur posteriorly on the calcaneous (Tr. 727; D.E. 16-12 at 48).

---

[4] The Global Assessment of Functioning ("GAF") scale rates overall psychological functioning on a scale of 0-100.  A GAF of 51-60 indicates moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Ed., 2000.

## HEARING TESTIMONY

Plaintiff attended four hearings, represented by counsel.  Three will be summarized, but where her testimony is repetitive it will not be included.[5]  At the hearing held on January 30, 2008 Plaintiff testified that she completed the ninth grade and did not obtain a GED.  Her uncontrolled diabetes causes spells of dizziness, fatigue, jitteriness, and disorientation.  Sometimes she has to eat or take a glucose tablet and lie down.  She has dizzy spells every day and feels tingling in her body (Tr. 63-65; D.E. 16-3 at 64-66).

She has had two bouts of painful corneal ulcers and has been told that she will have to see the eye doctor on a regular basis.  Diabetic Neuropathy causes her to feel numb below the knees.  She has to lie down and elevate her feet to stop the tingling and cannot sit for very long without her legs tingling (Tr. 65-66; D.E. 16-3 at 66-67).

Plaintiff has arthritis in her shoulders and it hurts to reach above her head (Tr. 67-68; D.E. 16-3 at 68-69).  She has migraine headaches and when she feels one coming on she tries to relax by lying down (Tr. 68; D.E. 16-3 at 69).  She has to lie down every day because of her various impairments.  She can sleep comfortably on the sofa during the day but has trouble falling asleep at night because of the pain in her hips (Tr. 69; D.E. 16-3 at 70).

She has memory problems and in the middle of the day she starts to slur her speech.  She often feels weak in the morning (Tr. 70; D.E. 16-3 at 71).  She does not drive much because of her dizzy spells.  She does not leave the house for social activities,

---

[5] The transcript of the hearing held on February 16, 2011, referenced in the decision finding Plaintiff disabled as of January 29, 2009, is not part of the record.

clubs or church because she feels safer at home (Tr. 70-71; D.E. 16-3 at 71-72).  She can walk around the house for approximately thirty minutes before she needs to rest.  She can walk about two blocks before her hip starts to hurt.  She cannot pick up anything heavy.  She has to sit in a padded chair because her coccyx bone has been injured twice and if she sits for more than fifteen or twenty minutes her hip begins to hurt (Tr. 71-72; D.E. 16-3 at 72-73).

The medical expert ("ME") summarized Plaintiff's medical records, noting that she is morbidly obese with her recorded BMI ranging from 38 to 42.  She has had poorly controlled Type 2 diabetes for eight or ten years, with very little evidence of end organ involvement except for possible sensory diabetic peripheral neuropathy.  There was no evaluation of dizziness in the record (Tr. 72-74; D.E. 16-3 at 73-75).  The ME thought Plaintiff could do light work with sitting or standing as needed and with no climbing of ropes, ladders or scaffolds.  She could occasionally climb stairs, stoop, kneel, crouch and crawl.  She should not work around hazardous machinery (Tr. 75-76; D.E. 16-3 at 76-77).  There were no limitations regarding use of her hands, vision or communication (Tr. 76; D.E. 16-3 at 77).

The vocational expert ("VE") testified that Plaintiff's past work was light or medium with an SVP of from three to five[6] and that she could return to both of her

---

[6] "SVP" refers to the Specific Vocational Preparation, defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. An SVP of three indicates that preparation for the job is over one month and up to and including three months.  And SVP of five indicates the preparation for the job is over six

previous jobs (Tr. 78-80; D.E. 16-3 at 79-81).  She could not do the previous work if she had to elevate her legs for three hours per day of if she had to miss work more than two or three times per month because of her impairments (Tr. 80; D.E. 16-3 at 81).

At the hearing held on January 9, 2009 Plaintiff testified that her knee and hip pain had become worse (Tr. 25; D.E. 16-3 at 25).  If she stands for a long time it feels like her hip is going to buckle and when she sits she has to alternate sides because it hurts (Tr. 26; D.E. 16-3 at 27).

Plaintiff began using insulin to treat her diabetes in August 2006.  If she does not eat regularly her blood sugar drops and she becomes disoriented and slurs her speech (Tr. 26-27; D.E. 6-3 at 27-28).  The tingling in her calves and legs is very painful when she tries to sleep (Tr. 28; D.E. 16-3 at 29).  She also has heart palpitations and has been to the hospital several times for treatment where they give her medicine and send her home (Tr. 29; D.E. 16-3 at 30).  She experiences what she describes as "diabetic attacks" where she feels flushed and like she cannot speak very well or understand what people are telling her.  She has to take glucose or candy or juice and lie down for an hour to an hour-and-a-half.  That happened to her two or three times per week up until the last month when she started to change her eating habits and learned to control her blood sugar (Tr. 30; D.E. 16-3 at 31).

She does not sleep more than five hours per night because of pain in her hip and shoulder.  Driving hurts her knee and hip so her husband drives her around.  She has heel

---

months and up to and including one year.
http://www.occupationalinfo.org/appendxc_1.html#II (last viewed on July 26, 2013).

spurs that cause her a lot of pain when she stands up.  She had received steroid injections the previous month (Tr. 31-32; D.E. 16-3 at 32-33).

She has problems with anxiety and depression.  Going to the doctor causes her to have an anxiety attack and going anywhere makes her very nervous.  She feels like crying all the time and everything bothers her (Tr. 32-33; D.E. 16-3 at 33-34).  She does not take any medication for depression.  She has a lot of trouble with her memory (Tr. 33; D.E. 16-3 at 34).

Plaintiff is limited to about three hours per day of standing and walking because of pain in her heel and in her hip.  She spends most of her time lying down.  When sitting or lying down she elevates her legs to help the circulation and relieve the tingling in her calves (Tr. 34; D.E. 16-3 at 35).  She has migraine headaches approximately one time per week that begin as a throbbing pain in her temple and move to the back of her head.  She has to lie down and cover her face with a pillow because she becomes very light sensitive (Tr. 35; D.E. 16-3 at 36).

The ME testified that rather than heel spurs, Plaintiff probably has plantar fasciitis which will resolve over time, but would at least temporarily impair her ability to walk. She also thought Plaintiff was not limited in the use of her hands and that her diabetic neuropathy was not significant (Tr. 39, 42; D.E. 16-3 at 40, 43).  She also thought that Plaintiff's ability to understand and carry out detailed instructions and make work decisions was only slightly impaired but that she otherwise suffered no mental impairment (Tr. 40-41; D.E. 16-3 at 41-42).

The VE testified that Plaintiff would be able to return to her past work as a home health provider and fast food service manager, unless she was limited in her ability to reach and handle objects.  Under those circumstances she would not be able to return to her past relevant work (Tr. 48-49; D.E. 16-3 at 49-50).  However, given her transferable skills, she could work as the manager of a market, a dietary manager in a hotel or restaurant or a sales manager, all of which exist in significant numbers in the national economy (Tr. 49-50; D.E. 16-3 at 50-51).  If she were absent from the workplace at least twice a month on a regular basis she would not be able to sustain employment (Tr. 50-51; D.E. 16-3 at 51-52).

At the hearing held on March 28, 2012, the ALJ and Plaintiff's attorney noted that at least some of the records relied upon by the ALJ who rendered the favorable decision were not included in the record before the ALJ in the 2012 hearing.  The attorney referred to records related to thrombocytopenia and the fact that Plaintiff began seeing an oncologist in January 2009 and had seen her for two years (Tr. 809; D.E. 16-13 at 41).  Those medical documents are not in the record.

Plaintiff testified that a combination of diabetes and "ITP"[7] made her feel sluggish and unable to work (Tr. 818-819; D.E. 16-13 at 50-51).  At the time she fell she weighed around 277 pounds, but at the time of the hearing weighed 153 pounds (Tr. 820; D.E. 16-

---

[7] Plaintiff could not remember what the acronym ITP referred to, but said the last word was "purpura." (Tr. 819; D.E. 16-13 at 51).  She most likely was referring to "idiopathic thrombocytopenic purpura" a disorder that can lead to easy or excessive bruising and bleeding.  http://www.mayoclinic.com/health/idiopathic-thrombocytopenic-purpura/DS00844 (last viewed on July 23, 2013).

13 at 52).  She changed her eating habits and thought that was why she was losing

weight, but it was also because of her diabetes and ITP (Tr. 821; D.E. 16-13 at 53).

Although she did housework, she stopped to rest often and elevated her legs to

relieve the neuropathy and help with pain and swelling in her legs.  When the neuropathy

first started it was just in her feet, but now it travels up to just below her knees (Tr. 825-

828; D.E. 16-13 at 57-60).  Plaintiff was diagnosed with gout sometime in 2010 (Tr. 829;

D.E. 16-13 at 61).  All of her conditions have grown steadily worse over time and she has

not ever felt like she was able to go back to work (Tr. 830; D.E. 16-13 at 62).

Plaintiff and her husband had two grandchildren, ages 14 and 12, living with them

in 2008.  Her husband drove the children back and forth to school but they did not

participate in extracurricular activities (Tr. 832-833; D.E. 16-13 at 64-65).  Dr. Campos

recently told Plaintiff that she has rheumatoid arthritis (Tr. 835; D.E. 16-13 at 67).

The ALJ posed a hypothetical question to the VE, asking her to consider a person

of the claimant's age, education and work experience as of June 2008.  The person could

perform light work, lifting up to twenty pounds occasionally and ten pounds frequently,

standing and walking for six hours and sitting for up to six hours in an eight-hour work

day with normal breaks.  The person would have postural limitations of frequently

climbing ramps or stairs, never climbing ladders, ropes or scaffolds, frequently balancing,

stooping,  kneeling, crouching, occasional crawling, occasional reaching bilaterally and

frequent handling, fingering and feeling (Tr. 839-840; D.E. 16-13 at 71-72).  The VE

testified that such a person could not do Plaintiff's previous work, but could work as a

child care attendant, a counter clerk or a rental clerk, all of which are light, unskilled

entry level positions (Tr. 841; D.E. 16-13 at 73).  If a person had to move extra slowly, it would interfere with maintaining attention to work.  If a person needed thirty- to sixty-minute breaks in the morning and afternoon they would have a problem sustaining employment.  If a person needed to elevate her feet above her heart it would significantly interfere with the performance of any task (Tr. 842-843; D.E. 16-13 at 74-75).

## LEGAL STANDARDS

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*;  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).  The burden has been described as more than a scintilla, but lower than a preponderance.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988)(citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present.  But the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994)(citations omitted).  It is incumbent upon the Court to look at the evidence as a whole and take into account the

following factors:  (1) objective medical evidence or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him and (4) the claimant's age, education and work history.  *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)(citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work.  *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520.  The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

## DISCUSSION

In the opinion issued on April 19, 2012, the ALJ found that plaintiff had not engaged in substantial gainful activity from her alleged onset date of February 3, 2003 through January 28, 2009.  She further found that Plaintiff had severe impairments prior to January 29, 2009, namely, minimal degenerative joint disease of the knees, diabetes mellitus with neuropathy, depression, anxiety and atrial fibrillation.  In addition, the ALJ found that Plaintiff had non-severe impairments including hip problems, a corneal ulcer of the right eye and migraine headaches/hypertension.  The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled

a listed impairment.  The ALJ next determined that plaintiff had the residual functional capacity ("RFC") to perform light work, with the additional limitations of only frequently climbing ramps and stairs, but never ladders, ropes or scaffolds; frequently engaging in balancing, stooping, kneeling, crouching and occasionally crawling; only occasionally reaching with the bilateral upper extremities and frequently handling, fingering and feeling.  In addition, the Plaintiff would be limited to detailed, but not complex, tasks and instructions.  The ALJ next found that she could not perform any of her past relevant work, but considering her age, education, work experience and RFC, could perform jobs that exist in significant numbers in the national economy.  Thus the ALJ found Plaintiff not disabled prior to January 29, 2009 (Tr. 782-793; D.E. 16-13 at 14-25).

Plaintiff objects to these findings and argues that the ALJ erred when she determined that Plaintiff retains the ability to do light work.  Defendant responds that substantial evidence supports the ALJ's determination that Plaintiff can do light work.

### A.  Residual Functional Capacity to Do Light Work

A claimant's RFC is an assessment of her ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, which means eight hours per day, five day per week, or an equivalent work schedule.  *See* SSR 96-8p at *1, 1996 WL 374184 (S.S.A.).  In assessing RFC, the adjudicator must consider all of an individual's impairments, including those that are "not severe."  *Id.* at *5.

The ALJ determined that Plaintiff can do light work with additional limitations.

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking

or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls.  To be considered capable of performing a full range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 416.967(b).

### 1. Assessing Plaintiff's Credibility

Plaintiff testified that her ability to walk is limited by pain, numbness and tingling in her lower legs and hips.  She stated that although she can clean house, she must stop frequently to rest and elevate her legs.  She estimated that she could walk for no more than two blocks, or perhaps a total of three hours out of an eight-hour day.  Medical evidence supports diagnoses of uncontrolled diabetes with peripheral neuropathy, heel spurs and obesity, all of which would contribute to the symptoms described by Plaintiff.

The ALJ did not fully credit plaintiff's testimony; therefore her failure to do so must be examined in light of the regulations.  Social Security Ruling ("SSR") 96-7P addresses evaluation of symptoms in disability claims and in particular, the credibility of an individual's statements. The ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms.  The ALJ must next evaluate the intensity, persistence and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's abilities to do basic work activities. If the individual's statements regarding the intensity, persistence or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must consider the entire case record, including medical signs and laboratory

findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians, psychologists or other persons about the symptoms and how they affect the individual and any other relevant evidence.

In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by objective medical evidence, SSR 96-7P sets out the following factors, outlined in 20 C.F.R. 404.1529(c) and 416.929(c), which the ALJ should consider: (1) the individual's daily activities;  (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms, such as lying flat, standing for 15 to 20 minutes every hour or sleeping on a board; (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Finally, the Ruling sets forth the standard for making credibility determinations:

The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility.  The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently

> specific to make clear to the individual and to any subsequent reviewers the
> weight the adjudicator gave to the individual's statement and the reasons for that
> weight.  This documentation is necessary in order to give the individual a full and
> fair review of his or her claim, and in order to ensure a well-reasoned
> determination or decision.

SSR 96-7P, 1996 WL 374186 at *4 (S.S.A.).

In this case, the ALJ said she considered all of Plaintiff's symptoms to the extent

to which they could reasonably be accepted as consistent with the objective medical

evidence and other evidence in the record, but found that Plaintiff retained a high degree

of functioning prior to January 29, 2009.  The ALJ relied in particular on the 2006 and

2008 consultative medical examinations.  At the 2006 consultation Plaintiff's physical

examination was grossly normal and the doctor observed that she was able to stand, sit

and move about as well as lift, carry and handle objects (Tr. 460; D.E. 16-9 at 67).  At the

2008 consultation, Plaintiff's deep tendon reflexes were absent in her upper and lower

extremities with decreased vibratory and pin prick response and the doctor made the

same observations regarding Plaintiff's ability to move, lift and carry objects (Tr. 678;

D.E. 16-11 at 132).

Nothing in either consultation contradicts Plaintiff's claims that her ability to stand

and walk is greatly limited.  An observation that Plaintiff can stand and walk in the

doctor's office does not lead to the conclusion that she has the ability to stand and walk

for six out of eight hours in a day, especially in light of the diagnoses of uncontrolled

diabetes and neuropathy.  The ALJ's opinion does not indicate that she considered all of

the factors set forth in SSR 96-7P and Plaintiff's case should be remanded so that a

proper credibility assessment can be made.

### 2. Effects of Obesity and Heel Spurs on RFC

From 2003 through January 29, 2009, Plaintiff was consistently obese and consistently testified that she was limited in her ability to walk by pain and tingling in her lower legs and also by hip pain.  In making a determination of RFC of an obese claimant, the ALJ is supposed to consider what effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. SSR 02-1P, 2000 WL 628049 at *6 (S.S.A.).  In particular, the ALJ giving an RFC assessment must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  "The combined effects of obesity with other impairments may be greater than might be expected without obesity.  For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone."  *Id.*  In cases involving obesity, fatigue also may affect the individual's physical and mental ability to sustain work activity.  *Id.*

The ALJ did not discuss the effects of Plaintiff's obesity in her RFC assessment, other than to say that Plaintiff was obese and retained a high degree of functioning despite her obesity (Tr. 789; D.E. 16-13 at 21).  The ALJ should have discussed whether Plaintiff's obesity combined with her peripheral neuropathy affected her ability to stand and walk for six hours in an eight-hour day.

In addition, Plaintiff testified at the January 2009 hearing and the March 2012 hearing that she had painful heel spurs that made it difficult to stand and walk (Tr. 31-32, 826-827; D.E. 16-3 at 32-33, 16-13 at 58-59).  Records from August and December 2008

show that she was diagnosed and treated for heel spurs, but the ALJ made no mention of heel spurs in her decision.  Without a discussion of how the heel spurs affect plaintiff's ability to stand and walk, it cannot be said that the ALJ discharged her duty to determine whether Plaintiff could do  sustained work-related physical activities in a work setting on a regular and continuing basis prior to January 29, 2009.

## RECOMMENDATION

The Commissioner's determination that Plaintiff is not disabled is not supported by substantial evidence and it is respectfully recommended that the Commissioner's determination that plaintiff is not disabled be vacated.  It is further recommended that plaintiff's case be remanded to the Social Security Administration so that the ALJ can properly consider Plaintiff's subjective complaints regarding her limited ability to walk and stand along with the effects of her obesity and heel spurs on her residual functional capacity.  This recommendation for remand is made pursuant to the fourth sentence of 42 U.S.C. § 405(g).

Respectfully submitted this 7th day of August, 2013.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United* Servs. *Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).